BOARDMAN, APPELLANT, *v.* WOODMAN, EXECUTOR, APPELLEE.*

Where a will is to be proved in this court and issues are found for the jury upon averments that the deceased was not of sane mind, and was induced by undue influence, &c., the law regards the substance of the issues rather than the form, and as the whole object of the proceeding is to prove the will, the executor is entitled to open and close, whether he be the appellant or the appellee.

The opinion of witnesses, not experts, and who are not witnesses to the will, concerning the sanity of the testator, are not admissible in evidence.

Where a witness is offered as an expert, the question of his competency is for the court alone. It is entirely immaterial what the witness' own opinion may be as to his own qualifications or competency.

There is no presumption that a witness to a will who has deceased or is beyond the jurisdiction, would state one way or the other in relation to the sanity of the testator, if such witness were alive and present; hence the declarations of a deceased subscribing witness tending to show that he thought the testator to be insane are incompetent.

The opinion of an expert may be given upon the question of the testator's sanity, founded either upon his personal examination of and acquaintance with the intestate, or upon a hypothetical case stated to the witness, and so framed as to resemble the case under consideration.

In civil causes evidence of general good character is not admissible to rebut imputations of fraud or misconduct.

Mere moral insanity, disorder of the moral affections and propensities, will not, unless accompanied by insane delusion, be sufficient to invalidate a will or to incapacitate a person to make one.

When the testator is under a delusion on one or more subjects, but the will and its provisions were not in any way the offspring or result of the delusion, and were not connected with or influenced by it, then the testator is in law of sane mind for the purpose of making a will, and such a will is valid.

ISSUES on an appeal from the decree of the judge of probate allowing the will and codicil of Margaret Blydenburgh. The issues joined were : 1st. That Margaret, at the times of making, &c., was not of sane mind ; 2d. That she was induced to make the will, &c., by undue influence.

1. The court ruled that the executor was entitled to open and close, and to this the appellant excepted. The will was executed May 30, 1849, and the codicil June 13, 1855. Margaret died Jan. 1, 1862, unmarried, and aged nearly 74. Her heirs at law are John Boardman, Martha Smith, and Mary J. S. Woodman, children of her deceased sister Mary, and John H. Smith, son of her deceased sister Clarissa.

After the formal proof of the instruments, the appellant in the first instance, and then the appellee introduced much evidence bearing on the question of Margaret's sanity during nearly her whole life, consisting, in a great degree, of evidence of her acts, conversations and manner. Much evidence was introduced on both sides as to her treatment of and relations with those who now are her heirs at law, and Alfred Smith and his wife, who was her sister Clarissa.

2. The appellant proposed to ask Mrs. Sloper, a witness called by him, who had known Margaret for many years, and who had described minutely her acquaintance with Margaret, and Margaret's acts, conver-

*Decided July Term, 1865.

sations, and manner, as they came under her observation, to state her opinion formed from what she saw and observed of Margaret, as to Margaret's sanity; the appellee objecting to this question, the court declined to permit it to be asked and the appellant excepted.

John Boardman, the appellant, stated particularly his acquaintance for many years with Margaret; he also described minutely her acts, conduct and manner at his house in Boston, one night in April, 1859, when he described her as under much excitement. The appellant then proposed to ask him. "What was then your opinion as to the sanity or insanity of Margaret, on the night of her visit in Boston, as based on the facts you have disclosed and all other facts that then came to your knowledge, and also from her personal appearance and manner at the time?" To this question the appellee objected, the court sustained the objection, and the appellant excepted.

The same witness stated that on the occasion of this visit, he remained at the house to watch Margaret till she went away; that he did not think proper to leave the house till she left; the appellant then proposed to put this question to the witness, "State why you thought it not proper for you to leave the house till she went away?" Which was objected to by the appellee and ruled out by the court, and the appellant excepted.

3. The appellant offered to show by Mrs. Starbird, declarations as to Margaret's insanity, made after the execution of the will by Abigail H. Woodman, a deceased subscribing witness to the will, whose signature as such had been proved; but the court rejected the evidence, and appellant excepted.

4. Dr. Green, called by the appellee, was, after examination as to his qualifications, allowed by the court to be examined as an expert. The appellant proposed to ask him, "Whether he considered himself qualified to give an opinion as an expert on the subject of insanity?" Which being objected to by the appellee was ruled out, and the appellant excepted.

5. Dr. Green stated that he had attended Margaret professionally on several occasions, which he described, and that he had often seen and conversed with her at other times, and he stated various of these conversations and described her manner and appearance; subject to appellant's exception, the appellee was then permitted to ask Dr. Green, "From what you have seen yourself of Margaret, and from all the conversation and acquaintance you have had with her, what, if any, opinion have you formed upon the question of her sanity?" The objection stated by the appellant to this question was, that the question ought to be put by the way of a hypothetical case.

6. Much evidence was introduced on each side, as to the transaction at the time of the sale of a lot of land for a school house by Margaret to the district, and as to what she afterwards said in relation to it. The appellant introduced evidence that Margaret said Valentine Smith had deceived and defrauded her as to that sale; that she spoke of him as "coveting her lot," and said that it "reminded her of Ahab and Naboth's vineyard." The appellant then proposed to ask a witness, "What was and is the character and standing of Valentine Smith in society for hon-

esty and fair dealing?" The appellee objected to this question, the court ruled it out, and the appellant excepted.

There were various other exceptions taken to rulings of the court, relating to the admissibility of testimony which are not deemed to be of any practical importance.

Among other things the court instructed the jury:

That every person of the age of 21 years, and of sane mind, may dispose of his or her property by will.

That, in determining what is a sane mind, so far as relates to mental capacity, the law has reference to the act to be performed, and requires that the testatrix's mental capacity should be adequate to the purpose; that is to making the will in question; to determining upon and making the disposal of the property given by the will in the manner in which it is there given; that in order to have sufficient mental capacity to make the will, Margaret, at the time of making it, must have been able to understand the nature of the act she was doing, to recollect the property she wished to dispose of and understand its general nature, to bear in mind those who were then her nearest relatives as such, and to make an election upon whom and how she would bestow the property by her will; that she must have had the ability, the mental power or capacity to do this; that if she had, the law regarded her as of sufficient mental capacity to make the will; that if she had not this capacity at the time, &c., the jury would find her not of sane mind; but if at the time, &c., she had this capacity, the jury would inquire further, for in this case it was claimed that she was laboring under what is called active insanity, of which the test is *delusion;* that delusion is to be distinguished from error or mistake into which sane persons may fall; that it is an *insane* belief; a belief in something as existing which has no existence, or in the non-existence of what does exist, or in what is impossible from the nature of things or the circumstances of the case, where that belief is so held that it cannot be permanently overcome by proof or reasoning; that the mere fact of the possession of a delusion may not be sufficient to render a person utterly incapable of making a valid will; that a person of sufficient mental capacity, though under a delusion, may make a valid will; if the will is in no way the offspring of the delusion, it is unaffected by it; but that if the will is the offspring of the delusion, if the delusion causes it to be made as it is made, or if its provisions in any way result from or are affected by the delusion, it is not a valid will; that the will of a person, who has been or is ordinarily insane, will be valid, so far as this question is concerned, if made at a lucid interval, that is, when the testator is not in fact insane; is not under delusion; that mere moral insanity; insanity of the moral nature, that is disorder of the moral affections and propensities, will not, unless accompanied by insane delusion, be sufficient to invalidate a will or to incapacitate a person to make one; but that if they found moral insanity existing, it would undoubtedly lead them to scrutinize the evidence very carefully, to see if it was accompanied by delusion; that if they found that Margaret at, &c., had the requisite mental capacity for making the will, they would inquire whether she was at the time under delusion or not;

if she was not, they would find her of sane mind; if she was under delusion, they would inquire further, Was the will or were its provisions in any way the offspring or the result of the delusion, or so. connected with the delusion as to be influenced by it? If so, they would find that she was not of sane mind; but if the will and its provisions were not in any way the offspring or result of the delusion, and were not connected with or influenced by it, then she was of sane mind to make the will, and they would so find; that if the will was the result of delusion, whether as to her heirs, relatives, or any subject whatever, or was affected by such delusion, they would find her not of sane mind; that the law presumes every person sane till the contrary appears; takes him to be sane till he is shown insane; likewise, when a person is shown insane, the law presumes him to continue insane until the contrary is shown, unless the insanity shown appears to be of a temporary nature, like that sometimes occasioned merely by the violence of a temporary disease; such as the delirium of a fever, that passes away with the violence of the fever, or that sometimes occurring in a state of temporary intoxication, merely due to such cause and ceasing with the temporary intoxication.

Upon the second issue the court, among other things, instructed the jury, that undue influence, which will avoid a will, is not merely persuasion, but the use of such appliances and influences as to take away the free will of the testator—to substitute another's will for his; so that the instrument is not the expression of the wishes and determination of the testator in the disposal of the property, but of those of another; that, to vitiate a will, the influence must amount to force and coercion, destroying free agency; it must not be merely the influence of affection and attachment, or merely the desire of gratifying the wishes of another; and it must also appear that the will was obtained by this coercion; by importunity that could not be resisted; that it was made merely for the sake of peace, so that the motive was equivalent to force and fear; that if they found that Margaret was induced to make the will by such an influence, that is, by an influence amounting to force and coercion, and destroying her free agency, they would on this issue find that she was induced to make the will by undue influence; but if they found that the will was not obtained by such an influence, they would return their verdict on this issue, that she was not induced to make the will by undue influence; that upon this question obviously the state and condition of the testatrix in body and mind at the time of making the will, was an important consideration; for one sick in body and enfeebled in mind might be coerced by an influence that would be insufficient to take away the exercise of free agency in another, stronger of body and mind.

Similar instructions were given as to the codicil.

To these instructions the appellant excepted.

The appellant's counsel, in his argument, made a long statement of matters which he said were symptoms of insanity, some of moral and others of intellectual insanity, and asked the court to instruct the jury that as matter of law they were such—as for example, "that the symptoms of insanity are almost incapable of classification, and sometimes almost imperceptible; that changes of habits without any assignable

cause, are symptoms of insanity;" that "violent antipathies, strong suspicions, great singularities of habits and manners are symptoms of moral insanity," &c., &c., &c.; the court did not give these instructions, and the appellant excepted.

The appellant asked the court to instruct the jury, "that in this State any insanity whatever, moral insanity, or any other mental unsoundness, at the time of making a will, would invalidate it; that to be capable of making a valid will, the testatrix must be in all respects of sane mind; that if her mind was disordered in any of its functions, she was not competent to make a will under our statute." The court declined so to instruct the jury and the appellant excepted.

The appellant asked the court to give to the jury the following instructions, which the court did not give, except so far as they are contained in the instructions already mentioned as given to the jury:

"It being established by the proof and admitted by the appellee that in the year 1839, Margaret was clearly insane, the presumption of sanity, which applies ordinarily, is changed. Henceforth she is by law presumed to continue insane and to remain so, until this presumption is answered, and it is established by competent proof, that the insanity has ceased and reason has been re-established."

"When any derangement at any period has been established, the evidence in support of a lucid interval should be as strong and demonstrative as where the object of proof is to show derangement itself."

"The burden of proof is therefore upon the appellee to prove by positive testimony, that, at the time of the making of the will and codicil, insanity had departed and reason was re-established."

"Under the statute of New Hampshire, Margaret had no right to make a will, unless she was of 'sane mind.' Any aberration of the mind, any form of insanity, is within the statute. If moral insanity existed in her mind, either general or partial, or if monomania or partial intellectual insanity existed, she was not 'of sane mind' within the statute, and her will is therefore not valid." "Moral mania either general or partial is under the statute of New Hampshire sufficient to invalidate a will."

"In cases where a tendency to insanity is hereditary in a family, marks of singularity, of eccentricity, of peculiarity of the temper, disposition, habits and intellect, may show insanity or intellectual aberration, when the same things in a person free from the hereditary tendency to insanity would be insufficient to show insanity."

"Delusions or hallucinations are unequivocal evidences of insanity and of such intellectual insanity as will avoid a will."

"If these delusions are general, e. g., upon many or all subjects, they establish general intellectual insanity."

"If the delusion exist on one or two particular subjects only; and if they are accompanied by eccentricity, irritability, violence, suspicion, exaggeration, inconsistency, and the like; and especially where there is in the party an hereditary tendency to insanity, all this tends strongly to establish insane delusion."

"If the delusion instead of being general is partial, relating to one or

two subjects, yet if the delusion relates to the disposition of his proper-
ty, or to those to whom it would naturally go or be given, then the will
being the offspring of such delusion is invalid."

"Whenever it appears that the will is the direct offspring of the par-
tial insanity or monomania under which the testator was laboring, it
should be regarded as invalid, though his general capacity be unim-
peached; this point is very happily illustrated by Mr. Justice Sergeant:
If the erroneous and groundless impressions received during the time of
this delirium shall retain their hold, whether by some physical derange-
ment of the brain, or by some indelible stamp on the thinking faculties,
that person must be considered still under delusion; the effect continues,
and it is only by effects that we can judge of the exciting cause; and if
he is under a delusion, though there be but a partial insanity, yet if it
be in relation to the act in question, it will invalidate contracts general-
ly, and will defeat a will which is the direct offspring of that partial in-
sanity."

"Delusion on the vital point of the intentions, conduct and feelings
of the heirs being established, the will is invalid; even though it were
pre-eminently a rational act rationally performed."

The appellant excepted because the court did not give these instruc-
tions as asked.

The jury returned a verdict for the appellee on both the issues, which
the appellant moves to set aside because of the foregoing exceptions.

The questions arising on this case were reserved for the consideration
of the whole court at the Law Term.

*Richardson, Christie,* and *Birdseye,* for appellant.

I.   The issues present two questions for trial, in each of which the
burden of proof is on the appellant.   If no evidence is offered by eith-
er party, the presumption of law in favor of sanity gives the verdict to
the appellee.   The due execution of the instrument is not in controver-
sy, and it is not necessary for the appellee to prove it.   The right to
open and close is therefore clearly with the appellant.   *Seavey* v. *Dear-
born,* 19 N. H. 361; *Thurston* v. *Kennett,* 22 N. H. 151; *Bill* v.
*Vose,* 27 N. H. 215; *Belknap* v. *Kendall,* 21 N. H. 175; *Seward*
v. *Leggett,* 7 C. & P. 613.

"In Massachusetts the statute requires the person offering a will for
probate, to prove the sanity of the testator." *Crowninshield* v. *Crown-
inshield,* 2 Gray 524; *Brooks* v. *Barrett,* 7 Pick. 94; see, also, Red-
field on Wills, sec. 4, page 29, et. seq.

II.   The tendency both of legislation and judicial decisions, at the
present time, is very decided towards an abandonment of those strict
rules of evidence by which common law courts had shut out whole
classes of testimony of the most important and convincing character.
Thus it had become a settled rule of law, that every kind of pecuniary
interest in the suit should exclude a witness from giving any testimony
at all; no matter how fair his character, or how perfect his knowledge

of the facts in controversy.   And when the legislature compelled the courts to receive the evidence of those most interested, but whose knowledge of the facts must be most perfect, even the parties themselves, it was found to be a real advance in the cause of justice, notwithstanding the fears of conservative lawyers.

So also the great extension of equity powers and practice is broadly in derogation of the exclusive rules of the common law.

There cannot, therefore, be any general policy in favor of restricting the court, in its adoption of the practice applicable to cases like the present, to a narrow and limited range of evidence.   But on the contrary the uniform tendency of modern decisions and practice is towards a full and fair consideration of every source whence light may be obtained.

In our State, the admissibility of the opinions of witnesses in cases of insanity and the like, though not expressly decided, is very strongly implied and recommended.   *Hamblett* v. *Hamblett,* 6 N. H. 349; *Wheeler* v. *Blandin,* 22 N. H. 170.

And it would be taking a step backwards to prohibit the jury from considering such testimony, and availing themselves of whatever light might be obtained in this direction.

In the ecclesiastical courts in England, where this class of cases is generally tried, the opinions of witnesses have always been received. 1 Philm 88 and 90; 2 Philm 449; 3 Adams 79; 3 Hagg. 574.   In the United States Courts also the same rule prevails.   3 Wash. C. C. 580.

And in nearly every State in the Union, where this question has arisen, it has been decided to admit the opinions of the witnesses.   Even in Massachusetts, where the practice is the other way, the judges have expressed in strong terms their disapprobation of their rule.   To be sure, in some of the States, they also admit the opinions of witnesses in matters of value, quantity, and the like; and it remains to be seen whether this is not the wisest course for all.

The reasoning on which the rule is based, appears unanswerable, where the question is not controlled by authorities.   The impossibility of keeping out all matters of opinion; the difficulty of describing mental manifestations; the necessity of using language more or less indicative of the witness' judgment and opinion; all point towards the propriety of its unrestricted admissibility.   Redfield on Wills, 139, *et seq;* in Pennsylvania, 7 Serg. & Rawle. 90; 11 Serg. & Rawle. 14; 23 Penn. (11 Harris) 117; in Connecticut, 4 Conn. 203; 9 Conn. 102; in Indiana, 5 Blackf. 217; in Tennessee, 9 Yerger 329; in Georgia, 6 Geo. 324; in North Carolina, 2 Iredell Law Rep. 78; in Ohio, 12 Ohio 463; in Vermont, 7 Vt. 158; 17 Vt. 499; in Alabama, 13 Ala. 68 and 202; 24 Ala. 241; 25 Ala. 21; 33 Ala. 555; in Missouri, 12 Mo. 223; in Maryland, 7 Md. 67; 7 Gill 10; see also, in New York, 7 Barb. 314; 3 Sandf. 351; 5 Selden 371; in Massachusetts, 7 Gray 711; 1 Gray 339; in Mississippi, 12 Miss. 223.

III.   The declarations of the deceased witness to the will, might

qualify or negative all the presumptions arising out of such attestation. Suppose all the witnesses to a will are dead or disqualified; the statute allows the will to be proved, and gives it full effect and validity, on proof of the several signatures. Now suppose each of the three witnesses had frequently declared that the instrument was a mere device to quiet and soothe the ravings of a maniac; that they had no intention or expectation of performing a serious or binding act; and that the testator was utterly incapable of comprehending any portion of the transaction. Would not this evidence legitimately rebut the inferences and presumptions which the statute requires the court to draw on the proof of the signatures only? And if this witness has frequently stated that she always regarded Margaret as a crazy person, and incapable of making a valid will, why should it not be shown, to meet the presumption of sanity and capacity, which the statute infers from the act of attestation?

IV. Dr. Green is put in as an expert, which means that he is to explain to the court and jury matters of science that they cannot understand without his aid. Yet he is permitted to give his opinion "*from what he has himself seen.*" How is another expert to meet this, supposing the Doctor to have been entirely in error as to his conclusions? The facts on which he founds his opinion are only partially in evidence; they cannot be submitted to any other expert, who might form an opposite opinion if they were. There is no matter of science or skill in "*what he has himself seen.*" They are simply the observations of a witness, which he lays before the jury as other witnesses do, and from which the jury are to draw their own conclusions as in other cases.

An expert, as such, is to explain scientific terms, matters of art, hidden and unintelligible marks or indications, as identity of hand-writing, or genuineness of bank notes; and on these matters he gives his opinion. These are matters which can be submitted to every expert, and conflicting opinions may be compared and weighed. But unless a hypothetical case is stated, or certain facts, proved or agreed on, are submitted to an expert, of what value is his opinion, and how can the same subject matter be submitted to other experts, and in what way does a scientific explanation to the court and jury become possible? 1 Greenl. Ev. 489; *Concord Railroad* v. *Greely*, 23 N. H. 243; Redfield on Wills, 151, *et seq*.

V. The instruction that mere moral insanity, insanity of the moral nature, that is, disorder of the moral affections and propensities, will not, unless accompanied by insane delusion, be sufficient to invalidate a will, or incapacitate a person to make one, is believed to be erroneous; Ray on Insanity, (Ed. 1844,) secs. 123 to 127, and also 215; where it is said that general moral mania furnishes good ground for invalidating civil contracts, notwithstanding the apparent integrity of the mental powers. Redfield on Wills, 82, sec. 13.

VI. The instruction that a monomaniac may make a valid will, pro-

vided the will is not the offspring of, nor affected by, such monomania, ought not, and, we think, cannot, under our statute, be sustained. The statute requires that a person, to be able to make a will, must be of sane mind, and it is certainly absurd to hold that a person who is confessedly a maniac on one or more subjects, is a person of sane mind. *Waring* v. *Waring*, 6 Moore P. C. cases 349.,

VII. We do not intend to waive the other exceptions stated in the case, but desire the attention of the court to them all; and we reserve the right to call attention to them hereafter, when time and occasion permit.

*Wheeler & Hall*, and *J. Smith*, for appellee.

I. The appellee was entitled to open and close. *Brooks* v. *Barrett*, 7 Pick. 94; *Comstock* v. *Hadlyme*, 8 Conn. 254; Sargent, J., in *Judge of Probate* v. *Stone*, 44 N. H. 593, p. 605; Redfield on Wills, 30, 31, *et seq.*

The cases of *Southerlin* v. *M'Kinney*, and *Tillman* v. *Hatcher*, Rice (So. Car. Law) 35, 271, are not in point. An appeal in South Carolina has a different effect from an appeal here. In *Tillman* v. *Hatcher*, p. 37, *Evans, J.*, said, "the appellee has the decision of the court below in his favor. His rights are fixed. Until that decision is reversed, his position is purely passive." In New Hampshire, on the contrary, the appeal vacates the decree in the probate court. *Mathes* v. *Bennett*, 21 N. H. 188. The executor must obtain a decree in this court allowing the will, or the appellant and his co-heirs will take the estate as heirs at law. The executor therefore stands in the position of plaintiff in these proceedings, and under our practice requiring him to offer the same formal proof of execution as was requisite in the probate court, (*Perkins* v. *Perkins*, 39 N. H. 163,) must go forward, and open and close. Besides, "if the record contains several issues and the plaintiff holds the affirmative of any one of them, he is entitled to begin." Here the appellee holds the affirmative of the issue on sanity. *Bell, C. J.*, in *Perkins* v. *Perkins, ubi sup.*, p. 171.

II. The opinions of all witnesses, who were not experts, on the question of sanity were rightly excluded.

Although the question of the admissibility of such evidence was expressly left open in *Hamblett* v. *Hamblett*, 6 N. H. 333, p. 349, yet it is believed the practice in this State has been to exclude these opinions, and such we understand to have been the ruling made in the Cilley will case by the same judge who delivered the opinion in *Hamblett* v. *Hamblett*. Certainly the general tendency of our decisions, rejecting evidence of opinions of value, &c., is opposed to the appellant's view.

Decisions adverse to the admission of opinions on sanity have been made in several States. *Commonwealth* v. *Wilson*, 1 Gray 337; *Needham* v. *Ide*, 5 Pick. 510; *Commonwealth* v. *Fairbanks*, 2 Allen

511; *Commonwealth* v. *Rich*, 14 Gray 335; *Dewitt* v. *Barley*, 9 N. Y. Court of Appeals, (5 Selden) 371; *Wyman* v. *Gould*, 47 Me. 159; *Gehrke* v. *The State*, 13 Texas 568. It is believed there is no English authority for the admission of this evidence save the practice of the ecclesiastical courts whose decisions in matters of evidence are not binding on the courts of law. (See *Mason, J.*, in *Dewitt* v. *Barley*, *ubi sup.*, p. 377–379.) The general rule that opinions of witnesses are not evidence is well established.

Ordinary witnesses are incompetent to form correct opinions on the question of sanity. The diseases of the mind constitute a special branch of medical science, which requires thorough training and study from him who would become acquainted with it, and unprofessional witnesses have not the knowledge requisite to the formation of correct conclusions on such subjects.

That courts of law have invariably taken this view abundantly appears from the universally established doctrine that experts may be allowed to give their opinions on questions of sanity. In all cases where experts are allowed to testify, their admission is on the ground that there is a question of science or skill involved which ordinary men are not qualified to form opinions on because they have not been through the "course of previous habit or study" requisite "to the attainment of a knowledge of the science." In such cases, to aid the jury in arriving at a correct conclusion, experts are allowed to state their opinions. The theory that the jury require aid from professional witnesses pre-supposes the inability of all unprofessional men to form correct conclusions on the questions involved. "The reasons which lead to a distrust of the unaided conclusions of the jury in such cases bear with equal if not with greater force against the opinions of ordinary witnesses," to say nothing of the fact that the jury, before making up their opinion, have the benefit of instructions from the court. It would seem that "the principle upon which the opinions of medical or scientific witnesses are admitted precludes the idea that laymen in general are competent to give opinions in such cases."

Furthermore, we say there is no inability on the part of ordinary witnesses to describe the facts in such cases if they are allowed proper latitude in describing in common language what they have seen.

III. The declarations of the deceased subscribing witness were properly rejected. *Baxter* v. *Abbott*, 7 Gray 71. The appellant is in error in supposing that the act of attestation furnishes evidence that the witness believed the testatrix sane. *Baxter* v. *Abbott, ubi sup.*; *Flanders* v. *Davis*, 19 N. H. 139. Even if the issue had been on *the due execution* of the will there is high authority for the position that declarations of a deceased witness could not be given in evidence to disprove the execution. *Stobart* v. *Dryden*, 1 M. & W. 615; 1 Greenl. on Ev. sec. 126; 1 Phillips on Ev. (4th Am. Ed.) 285–6.

IV. The question proposed to Dr. Green, "whether he considered himself qualified to give an opinion as an expert on the subject of in-

sanity," was properly ruled out. *Haverhill Loan & Fund Association* v. *Cronin*, 4 Allen 141; *Leighton* v. *Sargent*, 31 N. H. 119. The rule prescribing the qualifications of an expert is matter of law. *Jones* v. *Tucker*, 41 N. H. 546. Dr. Green, although an expert in insanity, was not an expert as to matters of law, and could not therefore be supposed to know what qualifications were required to constitute himself an expert. The appellant was allowed to cross-examine him at considerable length as to his qualifications, studies, practice, &c., and also to ask him "What is your confidence in your own opinion upon the question of insanity which you have expressed during this examination?"

V. The question calling for Dr. Green's opinion was in the proper form. The appellant seems to have confounded the case with that of an expert who has had no personal knowledge of the testatrix. "It has been decided often that medical experts may express a direct opinion upon the sanity of the testator where they have had opportunity to form such opinion from personal examination or acquaintance." Redfield on Wills, 154; see also 1 Leading Criminal Cases, p. 105.

The appellant says: "There is no matter of science or skill in what" Dr. Green "has himself seen." Perhaps not, but there is in forming a conclusion from what he has seen, and it is that conclusion which we asked for.

VI. The question proposed as to the character of Valentine Smith was clearly incompetent because it called for his present as well as past character. (See *Wyman* v. *Gould*, 47 Maine 159.) No inference can be drawn from his character at the present time, years after the testatrix's death, as to his character at the time when the testatrix charged him with fraud. (See *Elsam* v. *Faucett*, 2 Esp. 562.) But the question would have been incompetent had it referred only to Valentine Smith's character at the time of the testatrix's statements. Evidence of character is not admissible in civil suits to rebut imputations of fraud or misconduct. *Gough* v. *St. John*, 16 Wend. 646; *Attorney General* v. *Bowman*, 2 B. & P. 532, note a; *Matthews* v. *Huntley*, 9 N. H. 146; *Atwood* v. *Dearborn*, 1 Allen 483; *Houghtaliny* v. *Kilderhouse*, 1 Comstock 530; *Heywood* v. *Reed*, 4 Gray 574; *Givens* v. *Bradley*, 3 Bibb (Ky.) 195; *Ward* v. *Herndon*, 5 Porter (Ala.) 382; *Kentland* v. *Bissett*, 1 Wash. C. C. 144; *Nash* v. *Gilkeson*, 5 Serg. & Rawle, 352; Cowen & Hill's Notes to Phillips on Evidence, note No. 199.

VII. The court did not err in instructing the jury "that mere moral insanity, insanity of the moral nature, that is, disorder of the moral affections and propensities, will not, unless accompanied by insane delusion, be sufficient to invalidate a will or to incapacitate a person to make one." *Frere* v. *Peacocke*, 1 Robertson's Eccl. 442; *Den d. Trumbull* v. *Gibbons*, 2 Zabriskie (N. J.) 117.

VIII.   The instruction, that if the testatrix was under delusion, but "the will and its provisions were not in any way the offspring or result of the delusion, and were not connected with or influenced by it, then she was of sane mind to make the will," was correct.   *Dunham's Appeal from Probate*, 27 Conn. 192 ; (see especially *Ellsworth, J.*, pp. 202, 203 ;) *James* v. *Langdon*, 7 Ben Monroe (Ky.) 193 ; *Boyce, Adm'r*, v. *Smith*, 9 Grattan (Va.) 704 ; *Jenckes* v. *The Court of Probate of Smithfield*, 2 R. I. 255 ; *Greene, C. J.*, p, 261 ; *Gridley, J.*, in *Stanton* v. *Wetherwax*, 16 Barbour 259, p. 263.   *Waring* v. *Waring*, cited by appellant, is denied to be authority ; Redfield on Wills, 80–82, 85–86 ; 1 Parsons on Contracts, (4th ed.) 310, note *l*.

The New Hampshire statute, so far as it relates to sanity, was probably intended to be a re-enactment or codification of the English Statute of Wills, 32 and 34, Henry VIII., which enacted that "all persons"   *   *   *   (except   *   *   *   "idiots and persons of non-sane memory,") might by will, &c.   The mere change of phraseology, from a negative to an affirmative form, probably with a view to brevity, should not be made the ground of giving a construction to our statute which has not been adopted in any other State.

IX.   What constitute symptoms of insanity is a question of science and fact, not of law.   The court could not have given many of the instructions requested "without interfering with the province of the jury." The jury had heard the testimony of the medical experts as to the effect of insanity in the family, &c., &c., and the court, not claiming to have the qualifications of an expert, very properly declined to instruct the jury on these questions involving no matters of law.

SARGENT, J.   In *Judge of Probate* v. *Stone*, 44 N. H. 593, it was held that the party on whom the burden of proof in the first instance devolved was entitled to open and close ; that to determine which party is to begin, and of course which shall close, is to consider which would get the verdict, if no evidence were given on either side, and the right to begin is with the one who in that way would lose his case ; and that a verdict will be set aside when the court at the trial has given the close to a party not entitled to it.

In this case the issues sent from the law term were joined upon averments of plaintiff : 1st, that the testatrix was not of sane mind at the time of making said will, &c. ; and 2d, that she was induced to make the will, &c., by undue influence.   As these issues are made up the burden of proof would seem to be on the appellant, and not on the executrix, and hence that the ruling of the court was wrong, in giving the close to the executor.

But it is said in *Judge of Probate* v. *Stone*, p. 605, "in appeals from the probate court for proving a will, it matters not which party is the appellant.   The party who affirms that a will was made, has the primary burden of proof and the accompanying right to close."   Now the case states that this is a case of appeal from the decree of the judge

of probate allowing the will and codicil of Margaret Blydenburgh, and whatever form the issues which are sent to the trial term, may assume in such cases, the nature of the proceeding is never lost sight of, nor is the final object to be attained to be kept from view. The proceeding being such as is stated in the case, it is to be tried in this the Supreme Court of Probate according to the principles adopted and the rules applied for the trial of the same questions in the probate court. And the question to be determined, no matter in what form the issues may be drawn, is the due and legal execution of the will.

In *Perkins* v. *Perkins*, 39 N. H. 163, 167, which was a case like this, both in its nature, form and objects, and where the form of the issues was also the same as here, *Bell, C. J.*, in delivering the opinion says : "The object of the proceeding is to prove the due execution of a written instrument. In most cases such proof is offered in order to the admission of the instrument in evidence. But in the case of the proof . of a will the evidence is offered to lay the foundation of a decree that the will has been proved, which may supersede the necessity of proving it again. The substance of the proof is the same in both cases. The instrument itself must be produced unless in a few excepted cases where secondary evidence is admitted ; and the attesting witnesses must be produced and examined, if they are living and within reach of the process of the court. They are to be produced by the party who offers the instrument, or who seeks a decree that it has been proved.   *   *   *   * The usual formal proof being offered, the law comes in with its presumption that the party is sane, and this presumption stands until evidence is offered tending to raise a different belief.   *   *   *   Evidence being introduced, the issue is to be determined by the preponderance of the whole evidence as in other cases, though the party offering the proof of execution continues to have the legal presumption of sanity and capacity in his favor till the end.

Though ordinarily no question need be asked of the witness who testifies to the execution of an instrument, relative to the capacity of the grantor, yet, *owing to the nature of the proceedings in the case of wills*, that the probate of the will is the foundation of the grant of power to the executor, to take possession of the estate and the charge of administration, *it is, in that case, the long settled practice of courts of probate* to require that the witnesses to wills should be examined as to the fact of the sanity of the testator before the will is established.   *   * *This practice is equally binding as the law in such cases, upon the Supreme Court, as on the ordinary courts of probate.*"

In thus stating the long established practice in this State in cases of this kind, the reason will be seen why it has been the equally well established custom for the executor or administrator to open and close. It being understood that the object of the proceeding is to prove the due execution of the will without regard to the particular form of the issues, the executor must first produce the will to be proved, and call the subscribing witnesses if alive and within the jurisdiction. The affirmative is in fact on him, and he has uniformly been allowed the close.

If this class of cases, on account of the peculiar form in which

the issues are made up, must be considered as an exception to the general rule laid down in *Judge of Probate* v. *Stone*, they are there mentioned and recognized as an exception which has become established by a long and uniform practice in this State, which sustains the ruling of the court in this case on that point.    But if the true nature of the trial is to be regarded, if the question which is in fact to be settled is considered, if the substance of the issue instead of the form is to be noticed, then the rule as laid down in *Judge of Probate* v. *Stone* is correct in its application to these cases as well as others.    The ruling of the court must be sustained.

The second point in the case includes the second, third and fourth exceptions which all relate to the admissibility of the opinions of witnesses, not experts, upon the question of the sanity of the testator, said witnesses not having attested the will.    The ruling in this case is understood to be in accordance with the long established and uniform usage in this State, ever since the decision in *Hamblett* v. *Hamblett*, 6 N. H. 333.    There, the directions of the judge at the trial to the jury were "not to rely upon any evidence of opinion as to the sanity or insanity of the testator, except what was derived from the subscribing witnesses to the will."    There were no experts offered.    In the opinion that point is expressly left undecided, but it is believed that the ruling there made at the trial, has been since followed, and that the opinions of such witnesses have been uniformly excluded.    We are well aware that in many States the decisions are the other way, but there is by no means a uniformity upon this question.

There is not only much conflict in the decisions of different States and countries upon that point, but the grounds upon which such opinions have been admitted are to my mind entirely unsatisfactory.    In many of the leading cases in which such opinions have been held admissible, it has been upon the ground of necessity.    It is said that in questions of sanity, witnesses are generally unable from the nature of the case, to state the facts upon which their opinions are founded, and therefore that such opinion should be received in evidence, yet they almost invariably hold that before these opinions can be given the witnesses must state the facts upon which the opinion is founded, thus in effect compelling the witnesses to do the very thing which it has just been assured they cannot do, and imposing on them the very difficulty, the necessity of obviating which, was made a ground, and the principal ground, of establishing this exception to the general rule of evidence. Many of these authorities also hold that juries must be instructed to give these opinions little or no weight, unless appearing to be supported by the facts and circumstances which it has just been asserted that the witness cannot state intelligibly.

"A rule so fraught with contradictions" and which practically nullifies the reason of its adoption, can hardly command or receive the assent of the reason as a sound principle of law, even though a numerical majority of the decisions reported, and based upon such grounds and such reasoning, might be found to favor it.    We believe in practice no difficulty is found in the witness describing the acts, the sayings, and

appearance of the testator, so that the jury can judge as to what opinion ought reasonably to be formed from them quite as well and as fairly without the opinion of the witness upon the question of sanity.

Redfield in his treatise on Wills, page 144, after noticing the decisions of the several States where the opinions of witnesses, who were neither subscribing witnesses to the will, nor experts, have been allowed on the question of sanity, says : "This presents a considerable array of authority, sufficient, we think, to allow any court to decide the question in that direction, unless it regards the true principle applicable to the case as lying in the opposite direction." We think that the true principle lies in the opposite direction.

The general rule that opinions of witnesses are not evidence is well established and everywhere admitted. The rule that experts may give opinions on matters of science and skill stands upon distinct and independent grounds, and that rule is well established and everywhere admitted.

The exception that subscribing witnesses to a will, though not experts, may give their opinions in regard to the sanity of the testator, is placed by many upon the ground that the testator has selected and chosen these witnesses as being those best qualified to state in regard to all points necessary to be proved, in order to establish the will. But we are inclined to give little weight to this consideration since all who are familiar with the practice in such cases knew that ordinarily the testator has nothing to do with selecting the witnesses to his testament. The scrivener usually calls on those who are nearest at hand, and who can most conveniently be had to attest the execution of the instrument he has drawn. The latter reason we think, as stated in Redfield on Wills, p. 140, is to be found in the fact that the statute only requires credible or competent witnesses, and that it is not competent for courts to require in such a case more than the statute, or to say that when the statute defines the requisites of a witness, he is not to be regarded as competent to testify to every point directly involved in the issue, whether the paper presented for probate be the will of the alleged testator or not. We see no reason for carrying this exception any farther than the statute has thus carried it, in the case of sanity any more than on any other question.

In some States they allow the opinions of witnesses to be given on almost every subject. Perhaps it is not strange that there they should include insanity. But the tendency in this State has been to adhere to the well established rule, and to exclude the opinions of witnesses not experts. *Lowe v. Railroad,* 45 N. H. and cases cited.

We agree in opinion with the court in Massachusetts, as expressed in *Commonwealth* v. *Fairbanks,* 2 Allen 511, where it is said that in general where the jury have the facts in detail, they are as competent to form a correct judgment as the witness, and the practical experience of those familiar with courts shows that the defence of insanity is one easy to be made, and favorably listened to by juries. The rule, therefore, should not be extended beyond the adjudicated cases. The practice in this State we regard as well settled and uniform, both in civil and criminal cases, with the exception above referred to of the subscribing witnesses to wills, that

witnesses, not experts, may state the acts and sayings of the person whose sanity is questioned, and may describe his appearance, but may not give his present opinion as to his sanity or insanity, nor state the impression made upon witness' mind at the time of the acts, sayings or appearances testified to, in regard to the sanity or insanity of such person at such times. In either case it is but the witness' opinion based upon certain facts. Those facts he may state, but it is the opinion of the jury that is wanted on these facts, and not the opinion of the witness, unless he be an expert and so qualified to give an opinion that may aid the jury. We see no occasion to change the practice as thus established, but think that it accords with sound reason. The ruling of the court in excluding the opinions of these witnesses was correct.

What Green's own opinion was upon the subject of his qualifications as an expert was entirely immaterial. That question was for the court alone. The witness might state his acquaintance with the subject, what he had done to qualify himself, &c., but whether he had the qualifications of an expert, was a question of fact for the court to settle, and when the court had ruled that he was competent, the opinion of the witness on his own competency was in law entirely immaterial. *Jones* v. *Tucker*, 41 N. H. 546.

The declarations of the deceased subscribing witness were properly rejected. This question arose and was fully considered in *Stobart* v. *Dryden*, 1 Mees. & W. 615, and the evidence was rejected. Also in *Flanders* v. *Davis*, 19 N. H. 139, it was held that where the attesting witnesses to a deed were dead there was no presumption that if living they would testify that the grantor was of sane mind at the time of the execution and delivery of the deed. The same question was settled in the same way in *Baxter* v. *Abbott*, 7 Gray 71; 1 Greenl. Ev. sec. 126.

There is no presumption that a witness to a will will state one way or the other in regard to the sanity of the testator. There is no legal presumption because the name of a person appears on a will as attesting witness, that the person actually attested it. That fact must be proved by evidence of hand-writing or the production of the witness, or in some other way. Where the witness has deceased or is beyond the jurisdiction, there is no presumption as to what he would say if living and present. All the presumption there is in such case is that the testator was sane, until some evidence is produced from some source to prove the contrary.

The opinion of Dr. Green as to the sanity of the testatrix was properly admitted. The court had found the fact that he was competent as an expert. That made him competent to express an opinion upon the testator's sanity, founded either upon his personal examination of, and acquaintance with the deceased, (Red. on Wills 154; 1 Leading Criminal Cases, 105,) or according to our practice, upon a hypothetical case stated to the witness, and so proved as to resemble as near as may be the case under consideration. The jury can judge whether the case supposed is so far like the one they are considering as that the opinion of the expert on the supposed case is any guide to them in settling the question which they are to decide.

We think the ruling was also right in excluding the question as to Smith's character and standing in society, either at the time of the trial or of the transaction referred to in the evidence. Although in criminal charges the rule is deficient, yet in civil suits it has long been held that evidence of character is not admissible to rebut imputations of fraud or misconduct. *Matthews* v. *Huntley*, 9 N. H. 146, and cases cited; *Heywood* v. *Reed*, 4 Gray 574; *Atwood* v. *Dearborn*, 1 Allen 483, and other cases cited in appellee's brief. The only object of all this evidence about the sale of the lot of land, and Margaret's statement in regard to it, was to show that said Margaret was at the time of the sale, or at the time of the statements made, either sane or insane. The jury must settle the question of sanity at the time of sale, as they should find her acts in the sale to be most consistent with the one condition of mind or the other, taken in connection with all the facts and circumstances then existing, and known to her, and at the time of the statements made, according as they should find that the facts connected with the sale, as known or supposed to be known by her at the time of the statements made, did or did not justify such statements. Smith's general reputation and standing at any time could have nothing to do with the question of Margaret's sanity.

The ruling "that mere moral insanity, insanity of the moral nature, that is, disorder of the moral affections and propensities, will not, unless accompanied by insane delusion, be sufficient to invalidate a will or to incapacitate a person to make one," was also, we think, correct.

In *Frere* v. *Peacocke*, 1 Robertson's Eccl. R. 442, it was expressly held, *Sir Herbert Jenner Fust* delivering the opinion, that *moral insanity*, or the perversion of the moral feelings not accompanied with insane delusion, which is the *legal* test of insanity, was not sufficient to invalidate a will.

*Dew* v. *Clark*, 1 Adams 179, was a case of insane delusion on the part of the testator in regard to the character of his only daughter, whom he imagined to be vile, profligate, and depraved in the highest degree, and accordingly he treated her with the utmost severity and even cruelty, and finally cut her off in his will with an inadequate provision. But it was a dislike founded merely on delusion, for it was satisfactorily proved that while this delusion had gained such possession of his mind that nothing could shake his belief, yet in point of fact the daughter was amiable in disposition, engaging in her manners, of superior natural talents, diligent, dutiful, affectionate, modest and virtuous, and giving no occasion for the extraordinary feelings manifested by the father. The will being proved to be the direct result and offspring of this delusion, was set aside, *Sir John Nicholl* delivering the opinion, who held that "no course of harsh treatment, no sudden bursts of violence, no display of unkind or even unnatural feeling merely, could avail the daughter in proof to set aside this will, but that she must make out a case of antipathy clearly resolvable into mental perversion, and plainly evincing that the deceased was insane as to her, notwithstanding his general sanity." In the opinion he says :

"The true test of the absence or presence of insanity I take to be the

absence or presence of what, used in a certain sense of it, is comprisable in a single term, *delusion*. Whenever the patient once conceives something extravagant to exist, which has still no existence whatever but in his own heated imagination, and whenever at the same time having once so conceived, he is incapable of being, or at least of being permanently, reasoned out of that conception, such a patient is said to be under a *delusion*, in a peculiar, half-technical sense of the term, and the absence or presence of delusion so understood, forms in my judgment the only true test or criterion of absent or present insanity. In short, I look upon delusion, in this sense of it, and insanity to be almost if not altogether convertible terms."

He quotes Dr. Battie's opinion, that "deluded imagination is not only an indisputable but an essential character of madness." Also the opinion of Dr. Francis Willis, who says a sound mind is one wholly free from delusion. Weak minds differ from strong ones in the extent and power of their faculties, but unless they betray symptoms of delusion, their soundness cannot be questioned. An unsound mind, on the contrary, is marked by delusion, &c.

The case of *White* v. *Wilson*, 13 Vesey 88, was very similar—a case of disordered affections—but one proved to be founded on an insane delusion. Taylor's Med. Juris. (6th Ed.) 656, says a will may be manifestly unjust to the surviving relatives of a testator, and it may display some of the extraordinary opinions of the individual, yet it will not necessarily be void unless the testamentary dispositions *clearly indicate that they have been formed under a delusion*. Some injustice may possibly be done by the rigorous adoption of this principle, since delusion may certainly enter into a man's act, whether civil or criminal, without one being always able to discover it, but after all it is perhaps the most equitable way of construing the last wishes of the dead.

Some medical writers claim that delusion is not the test, and that moral insanity alone—disorder of the moral affections—where the will is to any extent the offspring of such perverted state of the affections, should invalidate the will. Taylor's Med. Juris. 556; Ray. Med. Juris. sec. 22. But the English courts, as we have seen, have manifested a reluctance to yield in any sense to the recognition of any such morbid affection as moral insanity. Red. on Wills p. 82. The same author says on page 72, that the consideration of this form of insanity (that is, moral mania,) is important chiefly in the administration of criminal jurisprudence. It is not often that it can be called in question in the testamentary act. Yet the American courts have had this subject before them in many different forms. *Lucas* v. *Parsons*, 24 Geo. 640 ; *Florey* v. *Florey*, 24 Ala. 241 ; *Jenckes* v. *Smithfield*, 2 R. I. 255, were cases where there was disorder or perversion of the affections, but in all of them this perversion of the affections was traced to an insane delusion, which had affected the mind.

In *Stanton* v. *Wetherwax*, 16 Barber 259, it is held that when a person conceives something extravagant to exist which has no existence whatever, save in his own heated imagination, but he is incapable of being reasoned out of that conception, such person may be said to be un-

der a delusion, and the absence or presence of *delusion*, so understood, forms the true test or criterion of absent or present insanity. Delusion in this sense of the word and insanity are convertible terms, adopting the view of Sir John Nicholl in *Dew* v. *Clark.*

In *Den d. Trumbull* v. *Gibbons*, 2 Zabriskie (N. J.) 117, the head note is as follows : "A will cannot be set aside on account of any moral obliquity, or prejudice of the testator, exhibited in the devises in it, or because the disposition of property in it is unnatural or unjust." "Strong, violent and unjust prejudices, if not founded on delusion, do not show mental incapacity."

In that case one Thomas Gibbons had by will given most of his property to his son, William Gibbons, but had disinherited his daughter Ann, and her husband John M. Trumbull, and their four children, who, after the decease of their mother, had leased to the plaintiff, who had by suit sought to recover possession of a farm given to said William Gibbons in his father's will. *Carpenter*, J., in delivering the opinion says : "But it has been urged with great earnestness on the side of the lessors of the plaintiff, that there was hallucination of mind on the part of the testator towards Trumbull and his family, a causeless and unwarrantable dislike, amounting to monomania, and that this state of feeling was caused, or at any rate participated in, by the son who thus obtained the disposition in his father's will. * * * While it is admitted that he (the father) was a man of more than ordinary vigor of intellect, yet it is said that he labored under a morbid state of mind of the character already mentioned, and that the will was the offspring of such feelings. Where delusion exists in the mind of a person on one or more subjects only, it is termed partial insanity. I do not question but that partial insanity will invalidate a will which appears to have been the direct result of such insanity, though the testator at the time of making it may have been sane in other respects upon ordinary topics." He adverts to the case of *Dew* v. *Clark*, before cited, and says, "that case turned on the fact of a remarkable delusion, *the only clear test of insanity*, unquestionably proved and it has since required the unqualified approbation of the profession."

The jury had been instructed at the trial "that they were to inquire not whether the will was a fair will, a just will, an equitable will, the will of a right-thinking man and a kind-hearted father, but is it Thomas Gibbons' will ?" It was held that these instructions were right, and that it was proper that the jury should not be permitted to err from feelings which possibly may have been excited by the harshness of the will, when the evidence was clear and the case free from doubt. And it was held, that, as there did not appear to be any delusion in the mind of the testator in regard to his daughter or her husband, but the feelings of anger manifested on his part towards them were caused by a lawsuit which they had instituted against him, and other family quarrels between them, the will, though it might seem harsh or even unjust, ought to stand.

In *Dennett* v. *Dennett*, 44 N. H. 531, it is held that all that the law requires to make a deed effectual, is that a man should have possession of his reason so as to understand the effect of the act he is about to perform, where there is no delusion. In 2 Greenl. Ev. 371, *a*, it is said,

in regard to insanity where there is no frenzy or raving madness, the legal and true character of the disease is *delusion*, or as the physicians express it, illusion or hallucination, and this insane delusion consists in a belief of facts which no rational person would believe.   It is distinguished from *moral* insanity which consists in the perversion or disordered state of the affections, or moral powers of the mind, in contradistinction to the powers of the understanding or intellect.   This latter state of the mind is held not sufficient to invalidate a will unless it is accompanied by that delusion in matters of fact, which is the test of *legal* insanity.

Some writers recently, in treating of the subject of mania or active insanity, draw a distinction between the *medical* and the *legal* definition of the term; the medical including moral insanity or the perversion of the affections, while the legal excludes it and knows no criterion of the existence of insanity but *delusion*; 3 Am. Law Reg. N. S. 1; and on page 6, it is said there is a difference, it will be observed, between the legal and medical theory of active insanity.   Delusion is essential to the legal idea of mania, but physicians do not attach the same importance to this feature of the disease.

It is difficult to conceive how insanity could be judicially established unless delusion of some sort were proved.   But delusion offers a practical test of active insanity, and it is difficult to see how in a will case it would be practicable to administer the law or do justice according to law if moral insanity were held sufficient to avoid a will.   See, also, 1 Jarman on Wills 56, and note; 3 Am. Law Reg. (N. S.) 385, 399.

*Delusion*, in the technical sense as explained by Sir John Nicholl and others, is, then, the legal test of the presence of active insanity, and if the will is the offspring of this delusion, it should be set aside, but if there is no such delusion, then there is no fact which is tangible as a matter of proof in a court of justice, upon which it would be safe or wise to act, and thus disturb those numerous testamentary dispositions of property which are made by those whose moral sense may be none of the keenest, or whose affections may not run in the same channel with those of their neighbors.

We all have likes and dislikes among our acquaintances and even among our relatives, and, it may be, among the members of our own families, for which we might not be able to give an intelligible reason, or one that would be satisfactory to another person, who did not see with our eyes and hear with our ears, and the operation of whose mind might not be like ours in every essential particular, and yet are we all insane because we dislike somebody that some one else likes, and because we make a will according to these peculiarities of our views, must it be set aside?   Better make a law that all a man's property should be divided equally among his relatives, without regard to the peculiar views or preferences of the deceased owner, and prohibit the making of wills altogether.   But so long as the law allows a man to do what he will with his own, he may exercise his individual privilege of having preferences and prejudices as between friends and relatives and even children, without his being called on to give any reason further.

These authorities and remarks, of course, apply to active mania or insanity only, and not to what is termed passive insanity, including idiotcy and imbecility.

The other instruction, that, if the testatrix was under delusion, "but the will and its provisions were not in any way the offspring or result of the delusion, and were not connected with or influenced by it, then she was of sane mind to make the will, was, we have no doubt, correct.   It was in accordance with the great weight of authority, ancient and modern, English and American, medical and legal.   Many of the cases already referred to go directly to sustain it, and many more might be adduced besides those cited in the brief of the appellee, but they are unnecessary. The only opposing decision, would seem to be *Warring* v. *Warring*, 6 Moore P. C. 349, but this has never been recognized as authority either in England or this country.   Red. on Wills 80, 86 ; 3 Am. Law Reg. 1, *et seq*.   We think the rulings and instructions at the trial were correct, and that there must be

*Judgment on the verdict.*

DOE, J., dissenting :—

I.   This is not a probate court, in a general sense or for all purposes. Many questions may be brought here by appeal from the probate court, but the appeal is a very different proceeding from that which brings a case from a justice of the peace.   The latter is general in form, and without any assignment of grounds or reasons of appeal.   A justice's case, when it reaches this court, is not limited by the appeal ; it is the same in form and substance as it was before the justice ; the whole case is to be tried as if it had been originally brought in this court.   But in probate cases there is no general appeal.   The appellant must set forth, in writing, the reasons of his appeal, and, in this court, he is restricted to such points as are specified in his reasons of appeal ; everything else, not being objected to, is impliedly assented to, and presumed to be correct.   Rev. Stat. ch. 170, sec. 2 ; *Patrick* v. *Cowles*, 45 N. H. 553. When an appellant, in his reasons of appeal, sets forth every possible objection to the probate of a will, and, in some other unusual cases, in which, to prevent a failure of justice, the probate jurisdiction of this court is construed liberally, every question concerning the probate of a will may arise here.   *Moses* v. *Julian*, 45 N. H. 52 ; *Perkins* v. *George*, 45 N. H. 453.   But, in this appeal, the will is not to be proved as if it were offered here for probate.   The decree of the judge of probate establishing the will as "proved, approved and allowed," was not vacated by the appeal.   Every decision of a judge of probate, so far as it is affirmed or unaltered, is in force from the time it was made.   Rev. Stat. ch. 170, sec. 12.   The object of this proceeding is, not to prove the will, but to determine the questions of insanity and undue influence. The executor does not seek a decree that the will is proved.   The formal execution of the will is established by the decree of the judge of probate, and admitted by the appellant.   That decree, left unaltered, renders it unnecessary to prove the will again, and continues the power

of the executor to take possession of the estate and the charge of administration.   The appellant cannot contest the formal execution of the will, because the only alleged reasons of appeal are insanity and undue influence.   Proof of the execution is irrelevant, and it may not be necessary for either party to produce the will, or a copy of it.   The only admissible evidence is such as tends to prove or disprove an allegation of the appellant.

On a probate appeal, if any fact material to the cause is disputed, the court may direct an issue proper to try such fact to be formed, and ascertain the same by the verdict of a jury.   Rev. Stat. ch. 170, sec. 11.   If the appellant had, in his reasons of appeal, declared that the will was not signed by said Margaret nor by any person in her presence by her express direction, or was not attested and subscribed by the witnesses in her presence, or that there were less than three witnesses, or that the witnesses were not credible, the court might have ascertained the truth of such allegations by the verdict of a jury.   But the only facts disputed in this appeal, were insanity and undue influence; there was, and there could be, no issue on any other subject; and the verdict was necessarily conformed to the issues.   The jury have found, and we have ascertained nothing but the absence of insanity and undue influence.   And if the jury had found, and we had ascertained, that, for every other possible cause, the writing propounded in the probate court, was not the will of Miss Blydenburgh, the decree of the judge of probate would remain in force notwithstanding the verdict.   That decree needs not, in any respect, or for any purpose, to be formally affirmed, and it cannot be reversed for any reason not alleged by the appellant.

Whether the form, or the substance, of the issues submitted to the jury, is regarded, the executor would be entitled to a verdict if no evidence were offered on either side.   The appellant must introduce some evidence to prevent the verdict being against him.   He must begin. And it was held in *Judge of Probate* v. *Stone*, 44 N. H. 593, that the party who must begin, has the right to close in argument, and that, if he is denied that right, the verdict against him must be set aside.

There is no occasion in probate appeals, for an exception to a general rule as to the right to close.   It is said that the party who has the necessity of beginning, has the privilege of closing; that with the burden of proof he takes the advantage of the last argument.   But it is often an advantage, and not a burden, to begin, without reference to the other advantage of having the close.   *Mercer* v. *Whall*, 5 A. & E. (N. S.) 447, 460 ; 3 Chit. Gen. Pr. 885.   When the plaintiff begins he is not entitled to the close as compensation for the necessity of making the first opening statement of evidence to be offered, for he is not required to make a statement, and if each party makes such a statement, their burdens, in that respect, are equal ; the defendant has no advantage because in his statement he is not permitted to argue or comment to the jury upon any part of the case.   The plaintiff is not entitled to the close as compensation for the disadvantage of proving his whole case first, for he is only required to make out a *prima facie* case in the first instance. *Pierce* v. *Wood*, 23 N. H. 519.   If the right to close is compensation

for the burden of proof, it belongs to the party who practically has the burden of the final preponderance of proof upon the question actually submitted to the jury ; and not to the party who has the primary burden of proof or the necessity of making a *prima facie* case, which is often a formal and nominal burden. *Ayer* v. *Austin,* 6 Pick. 225, 226. But the primary and final burdens of proof are imposed, not arbitrarily, nor for reasons that render compensation equitable and proper ; they are imposed by general principles of law, and because it is right that they should be borne without compensation. Upon the question of insanity in this case, there being a presumption of sanity, it is said that the appellant justly has the duty of showing insanity by a preponderance of proof, and the close cannot be given to him as deserved assistance in performing that duty, or as payment before it is known whether he will perform it ; and if, on the same question, the executor has the primary burden of proof which is sustained by the presumption, the law cannot reward him for a burden borne by the law and not by him.

If, in England, the common law rule which, in some cases, gave the closing argument to the party who began, was just and reasonable, it is unjust and unreasonable in this State. In English practice the opening is an argument, as well as a statement of evidence to be offered. It is so far the appropriate occasion for argument, that, at common law, the party who begins, is not entitled to make an argument at any other time unless evidence is introduced by the other party. A change was made in 1854, (Roscoe's N. P. Ev. 214 ; Best on Ev. Supplement 29,) but, at common law, if the plaintiff begins, and the defendant merely comments on the plaintiff's case and adduces no evidence, the plaintiff cannot reply for he has already been heard. He is not entitled to the close in all cases, but only when there is testimony on the other side. The reason that gives him the right to close in argument, is apparently that which gives him the right to introduce proof in reply to the defendant's case ; having made his argument and offered all the evidence competetn to support his *prima facie* case, he has no occasion to reply with other arguments or other evidence, if no evidence is presented by the defendant. And when evidence is given on both sides, and the plaintiff produces evidence in contradiction of some new facts stated by the defendant's witnesses, the defendant, in his second argument, is not entitled to reason upon the whole case, but on the subject of contradiction only. 1 Starkie Ev. 365 ; 3 Chit. Gen. Pr. 872, 880, 881, 885, 886, 903, 905, 906, 909, 910 ; *Pullen* v. *White,* 3 C. & P. 434 ; *Faith* v. *M'Intyre,* 7 C. & P. 44. The plaintiff must, in the first instance, present all of his evidence that is then competent. He cannot go into a part of his case and reserve the remainder till the defendant rests. 1 Gray Ev. sec. 74 ; 3 Chit. Gen. Pr. 883, 909, 910 ; *Rees* v. *Smith,* 2 Stark. 31 ; *Jacobs* v. *Tarlton,* 11 A. & E. (N. S.) 421. The plaintiff, in opening, argues upon his whole case, and the defendant, in opening, has an opportunity to reply to the plaintiff's argument, and to argue upon the plaintiff's evidence and his own. The theory seems to be, that the second argument of the defendant is upon the plaintiff's replying evidence, and that the plaintiff's second argument is upon the defendant's

evidence and the plaintiff's replying evidence, and that the plaintiff has the close, not because he began, but because the defendant has introduced evidence upon which the plaintiff should have an opportunity to comment.

If such is the theory upon which the English rule as to the close is founded, it is immaterial whether the English practice does, or does not, correspond strictly and fully with the theory. There is no theory or practice, in this State, upon which that rule can stand. Here, no argument is allowed in the opening on either side, and the party who is not entitled to begin, has no opportunity to reply to the argument of the other party, as he has in England. These contrary results of the same rule in diverse systems of practice, show that if the rule is right in England, it is wrong in this State, and that, if it is right here, it must be established upon independent grounds, and not upon English authorities, or upon rules or decisions based solely on English precedent.

By the practical operation of the common law rule in England, when evidence was given on both sides, each party had an opportunity to reply to the argument of the other; by the operation of the same rule in New Hampshire, only one party has that opportunity. The result in England is manifestly just—is in analogy to the arrangement of pleading and evidence, and should be reached through some reasonable and convenient rule of court. The pleadings show who must begin; the closing argument belongs to the party who, upon the main questions submitted to the jury, is practically and substantially on the defensive. The first address on each side after the conclusion of the evidence, should be the only opportunity for general argument; any subsequent speech should be a reply strictly limited. At some time, in some manner, each party should be allowed to reply to any view of the evidence, or any course of reasoning, presented on the other side, which he could not reasonably have anticipated, and by which he is surprised and his cause endangered. There should be no unyielding rule, under which either party might be prejudiced for want of an opportunity to make a proper reply, or under which the court might seem called upon to prevent injustice by suggesting a reply which ought to be made by counsel. In our practice, the English rule giving the close in argument to the party who begins, is purely arbitrary. To grant a new trial when the close is given to the party not entitled to it under that rule, is to destroy a verdict because the losing party did not have an unfair advantage over his opponent. If the right to close is so valuable that the verdict depends upon its being assigned in accordance with such a rule, it is too important a right to be monopolized by either side. Neither party should have so great an advantage over the other.

When the burden of establishing a preponderance of the evidence is put upon the wrong party, the verdict, if against him, may be set aside. But a verdict is not disturbed on the ground that the wrong party was permitted to open or to close, unless it clearly appears that some substantial injury has resulted. This is a sound principle fully sustained by numerous authorities. The only case in conflict with them, cited in *Judge of Probate* v. *Stone*, is *Davis* v. *Mason*, 4 Pick. 156. How

can the right to close be a strictly legal right, when it may be taken away by a rule of court? *Robinson* v. *Hitchcock*, 8 Met. 64. The order of argument is a matter of practice, relating to the conduct of trials, and not a principle of law governing the rights to be established by trials, and it is within the discretion of the court whose ruling is not reversed unless it has produced actual injustice. 1 Ph. Ev. 819, 4th Am. Ed. ; Hilliard on New Trials 298 ; *Marshall* v. *Wells*, 7 Wis. 1 ; *Belknap* v. *Wendell*, 21 N. H. 175, 182 ; and authorities cited in *Judge of Probate* v. *Stone.* The order of argument cannot be withdrawn from the discretion which includes the length of argument, Rule of Court 47 ; 38 N. H. 592, the character of the opening speech, *Rich* v. *Jones*, 9 Cush. 329, the number of witnesses, *Cushing* v. *Billings*, 2 Cush. 158, the order of proof, *Pierce* v. *Wood*, 23 N. H. 519, 532 ; *Kent* v. *Tyson*, 20 N. H. 121 ; *Severance* v. *Hilton*, 24 N. H. 147 ; *P. & T. R. R.* v. *Simpson*, 14 Peters 448, 463 ; *Goss* v. *Turner*, 21 Vt. 437 ; *Burke* v. *Miller*, 7 Cush. 547 ; *Chadbourn* v. *Franklin*, 5 Gray 312 ; *Ward* v. *Fuller*, 7 Gray 179 ; *Wright* v. *Willcox*, 9 M. G. & S. 650 ; *The Queen's Case*, 2 B. & B. 301 ; *Williams* v. *Davies*, 1 C. & M. 464 ; 1 Gr. Ev. secs. 74, 75, 76, 431, 447, 449 ; Colby's Pr. 236, 237, 238 ; 3 Chit. Gen. Pr. 901 ; 2 Saund. Pl. & Ev. 1285 ; Hilliard on New Trials 297, 309 ; *Williams* v. *Davis*, 1 Cr. & M. 464 ; *Doe* v. *Bower*, 16 A. & E. (N. S.) 805 ; *Com.* v. *Hall*, 4 Allen 305, and separate trials when there are several defendants, *Eames* v. *Stevens*, 26 N. H. 117.

II.    The verdict on the issue of sanity should be set aside, because the opinions of ordinary witnesses, founded upon personal observations of the appearance and conduct of Miss Blydenburgh were rejected. Since the decision in *Dewitt* v. *Barley*, 9 N. Y. 371, was overruled in the same case, 17 N. Y. 340, there has been almost perfect unanimity of authority in favor of such testimony. The supposition that such opinions are not received in the English common law courts is erroneous. *Eagleton* v. *Kingston*, 8 Ves. Jr. 438, 449, 450, 452 ; *Tatham* v. *Wright*, 2 Russ. & Myl. 1, pp. 375, 376 of Ingraham's edition ; S. C. under the name of *Wright* v. *Doe d. Tatham*, 1 A. & E. 3, 12 ; S. C. 7 A. & E. 313, 325, 326, 340, 351, 359, 372 ; S. C. 5 Cl. & Fin. 670, 680, 684, 686, 687, 690 691, 699, 714, 719, 724, 735, 738, 746 ; Erskine's Speeches, vol. 1, pp. 507, 517. The admissibility of such opinions seems never to have been doubted in England, unless by *Coleridge, J.*, in 5 Cl. & Fin. 690, 691. They are competent because, considered in connection with the means of observation on which they are based, they are the best evidence of which the case in its nature is susceptible. From the nature of the subject, it cannot generally be so described by witnesses as to enable others to form an accurate judgment in regard to it. For like reasons, the opinions of non-experts are received as the best evidence in regard to identity, handwriting, age, form, size, weight, measure, strength, speed, time, distance, heat, cold, quality, quantity, number, and a great portion of the most familiar facts and occurrences of common life. Practical reasons

for admitting the opinions rejected in this case, are given in Redfield on Wills 136–139, 145, note 25; *Baxter* v. *Abbott*, 7 Gray 71, 79; *Dewitt* v. *Barley*, 9 N. Y. 388, 390; 17 N. Y. 340; and *Clary* v. *Clary*, 2 Ired. 78.

Some of the authorities require the witnesses first to state the facts upon which their opinions are founded. Enough of those facts must be stated to show that the opinions are founded upon matters within their own knowledge and observation, and not on hearsay or the proof before the jury. Experts alone can give opinions upon the usual abstract questions and hypothetical cases touching this subject. In this case it was necessary for Dr. Green and the subscribing witnesses to state some of their means of forming opinions as to the sanity of Miss B. before giving their opinions directly on that point; and it would have been a proper exercise of the discretionary power of the court, to require them first to state all their means of knowledge, as the value of their opinions necessarily depending somewhat thereon, all such means could be brought out on cross-examination, and would appropriately precede the statement of opinion as they preceded the formation of it. The opportunities of observation, and the facts and appearances observed, are competent evidence. A witness must give some evidence of that kind to render his opinion competent, as when he gives an opinion upon a question of identity or hand-writing; when it appears that he had some means of forming an opinion, whether he shall state all his means first is a matter within the discretion of the court.

The opinion of an unprofessional witness is competent, not because he can give no description of the appearances which indicate sanity or insanity, but because, ordinarily, he cannot give an adequate description of them. The law, always demanding the best evidence, receives his opinion because his description of symptoms alone is not the best. The admission of the opinion is not the exclusion of the description. That the opinions of non-experts are not rejected by the reception of the opinions of experts, is shown in the uniform practice on questions of hand-writing.

The distinction in regard to allowing the subscribing witnesses to a will, a peculiar privilege in giving their opinions, and denying that privilege to others, is rightly pronounced by Judge Redfield to be wholly groundless and absurd. But the admission of the opinions of the subscribing witnesses shows that the fear that jurors are not qualified to weigh the opinions of unprofessional persons has not assumed the form of a rule of law. The subject of the competency of evidence and the mode of practice, as affected by the character of the tribunal, is alluded to in *Stephens* v. *People*, 19 N. Y. 549, 556; *Wright* v. *Tatham*, 5 Cl. & Fin. 670, 692, 769; and *Ashby* v. *Bates*, 15 M. & W. 589, 594, 596. The employment of great subtlety in excluding evidence, in this State, may have been encouraged by a distrust of the capacity of jurors. Some peculiar, narrow, and inconvenient rules have gradually become established here, in derogation of the common law. Among them, is the rule which excludes opinions as to value of property. That rule is supposed to be based on the ground that, in general, opinions

are not admissible, and that the value of property is not one of those subjects upon which witnesses may testify as experts. In that view, the rule which requires the best evidence is overlooked, although it is the fundamental principle upon which all the rules of evidence are framed, and beyond which none of them can extend. Best on Ev. secs. 87, 88. Opinions, when competent, are received, not under exceptions to auxiliary rules, but upon the primary principle which such rules were designed to carry into effect.

The executor was permitted to ask several of his witnesses whether they ever observed anything peculiar or strange in Miss B.'s conduct or conversation, or manner of expressing her views on religious subjects, or otherwise, other than they had stated, and one of his witnesses—a lady—was allowed to testify that she could not tell what Miss B. said on religious subjects, but that she talked well. *Hamblett* v. *Hamblett*, 6 N. H. 333, 344. To ask a witness, on such a trial, whether Miss B. appeared peculiarly, or strangely, was substantially to ask whether, in the witness' opinion, she was insane. The appellant's witnesses were allowed to testify that she appeared excited. It is some consolation to reflect, that, where the refinements of the law attempt to enforce a rule of evidence not based upon reason or principle, or the common experience of mankind, it is usually found impracticable in its application to the detail of a trial. Redfield on Wills 145, note 25. But this consolation is diminished by the fact that swift witnesses, however instructed, checked and reprimanded, generally succeed in giving their opinions, while the cautious and impartial, whose opinions are much more valuable, are often limited to very meagre and unsatisfactory testimony.

Witnesses, not experts, may testify that a horse appeared well and free from disease. *Spear* v. *Richardson*, 34 N. H. 428 ; *Willis* v. *Quimby*, 31 N. H. 485. They may testify that a man appeared to be sick or well, although they may not be qualified to give their opinions as to the character, cause, duration or proper treatment of particular diseases ; and they are competent to give opinions upon the presence or absence of mental, as well as of physical, disease. They may say that a person was cheerful or depressed, that he seemed to recognize, or not to recognize, his friends and acquaintances, that he appeared as usual or not as usual, naturally or unnaturally, peculiarly and strangely, or otherwise, all which are matters of opinion. Opinions as to insanity and intoxication stand upon very similar ground ; *People* v. *Eastwood*, 14 N. Y. 562 ; *Fenton* v. *Holloway*, 1 Stark. 126 ; and, as to the condition of mind in other respects, they are competent. *McKee* v. *Nelson*, 4 Cowen 355, cited in *Robertson* v. *Stark*, 15 N. H. 109, 114 ; *Trelawney* v. *Colman*, 2 Stark. 191. Such opinions as those rejected in this case, were received in *Corey's Case*, Cheshire, 1830, and in *Prescott's Case*, Merrimack, 1834.

III. The verdict on the issue of sanity should be set aside, because the court instructed the jury that delusion is the test of what was called active insanity ; and that moral insanity without delusion does not incapacitate a person to make a will. The provisions of the statute which

require testators to be of sane or sound mind, (Rev. Stat. ch. 156, secs. 1, 6; ch. 1, sec. 15,) are unnecessary. A provision that any person might dispose of his property by will would be construed to confer that power only upon persons mentally competent to exercise it, as in the case of deeds, (Rev. Stat. ch. 130, sec. 1,) and crimes. The statute does not define insanity, or prescribe any degree or test of intelligence or soundness. It uses general and familiar terms, to indicate that the principles of the common law are to be applied to questions of mental competency in the probate of wills. Those principles are found in the definitions of contracts and crimes. A contract is an actual or presumed mental agreement between parties of sufficient capacity. A merely formal and apparent agreement produced by mental disease or undue influence or constraint, is not a contract. *True* v. *Ranney*, 21 N. H. 52; *Keyes* v. *Keyes*, 22 N. H. 553; *Burke* v. *Allen*, 29 N. H. 106. In a criminal case, the jury must be satisfied beyond a reasonable doubt of the prisoner's mental capacity to commit the crime charged. This is but an application of the general principle that the criminal intent must be proved, as well as the act; that, without a capable mind, such intent cannot exist, the very element of crime being wanting. *State* v. *Bartlett*, 43 N. H. 224. Such terms as "criminal intent," "vicious will," and "use of reason," are used in a very broad and general sense including the idea that the mind must be in such a responsible condition as to be capable of giving a guilty character to the act. The will does not join with the act, and there is no guilt, when the act is directed or performed by a defective or vitiated understanding. 4 Bl. Com. 20, 21, 24. So far as a person acts under the influence of mental disease, he is not accountable. *Prescott's Case*, (Merrimack, 1834,) p. 148. The insane are not exempted from the obligation of their contracts, or the punishment of their crimes; but they may be incapable of making contracts or committing crimes. They are bound by their contracts, and are punished for their crimes, as if they were sane. The question is, not whether they are relieved, by some special and peculiar exception, from the operation of general law, but whether they have done anything, which, under general law, amounts to a contract or a crime. The peculiar cases of contract in which a party is not permitted to set up his own insanity without restoring the other party to his former position, or making compensation, are not exceptions, but are applications of the general doctrine of estoppel. In consequence of the want of medical knowledge in times past, inappropriate terms have been used in treatises and decisions, but the general theory of the common law is, that the free operation of a sound mind is the essence of contract and crime, that contracts and crimes do not consist of mere acts or words, and cannot be produced by mental disease. A product of healthy, infantile immaturity, or of disease of the mind, is not a contract, a crime, or a will.

The question whether Miss Blydenburgh had a mental disease was a question of fact for the jury, and not a question of law for the court. Whether delusion is a symptom, or a test, of any mental disease, was also a question of fact, and the instructions given to the jury were er-

roneous in assuming it to be a question of law. The jury should have been instructed that if the writing propounded in the probate court was the offspring of mental disease, the verdict should be that Miss Blydenburgh was not of sound mind. Insanity, other than the healthy absence of development in infants, is the result of a certain pathological condition of the brain—a condition in which the intellectual faculties, or the moral sentiments, or the animal propensities, have their free action destroyed by disease whether congenital or acquired; and the tests and symptoms of this disease are no more matters of law than are the tests or symptoms of any other disease in animal or vegetable life. If a jury were instructed that certain manifestations were symptoms or tests of consumption, cholera, congestion, or poison, a verdict rendered in accordance with such instructions would be set aside, not because they were not correct, but because the question of their correctness was one of fact to be determined by the jury upon evidence. Experts may testify to the indications of mental disease, as they could not if such indications were matters of law. Wharton's Cr. Law 48; 1 Ben. & H. Ldg. C. C. 105–108; *Com.* v. *Rogers*, 7 Met. 500, 505, 506; *Rex* v. *Wright*, 1 Russ. & Ry. 456; *Regina* v. *Frances*, 4 Cox C. C. 57. The jury, in deciding whether delusion is a test, would naturally and properly rely upon the testimony of experts. Delusion, as a test, seems not to have been heard of in the law before the year 1800, and was not a part of the common law of England when that common law was adopted in our constitution.

The misunderstanding which prevails on this subject, arises from the fact that medical errors of former days gained the sanction, and the name, of law, by being published in law books of high authority. Such a transformation was not difficult in times when courts were accustomed to instruct juries in regard to matters of fact and weight of evidence, and when the distinction between the duty of the court and the duty of the jury was not clearly defined and observed in practice. Hale and Coke unfortunately copied the opinions of the medical authorities of their day on the subject of insanity, and their successors were slow to question anything endorsed by so great names. The errors of those opinions have in time been discovered and abandoned. But it has not been sufficiently observed that they were medical errors corrected by medical men. And now the other medical theory that delusion is a test, introduced long after the times of Hale and Coke, having been adopted by an ecclesiastical court in England, is claimed to be law, although it is purely a matter of science. The decisions of the ecclesiastical courts are not authorities on this point, for, in those courts, the judges are judges of fact as well as of law. The authorities that recognize delusion as the test, are based on *Dew* v. *Clark*, 3 Addams 79, decided in 1826, in which case Sir John Nicholl said: "The court is confirmed in, or rather possibly has derived, this its own view of the subject, by and from writers as well medical as other, best qualified to discuss it, and upon whose authority accordingly it may safely rely. It is thus, I apprehend, that *delusion*, in the sense that I have explained it, is made the distinguishing feature of insanity by Dr. Battie in the first chapter of

his celebrated essay or treatise on that disorder. On the same principle it is that Dr. Willis, in a recent publication on mental derangement, lays it down that insanity *from disease*, (as contradistinguished from *native* insanity,) chiefly consists in the 'pertinacious adhesion of the patient to some *delusive* idea in opposition to plain evidence of its falsity.' And Mr. Locke, in treating of the difference between idiots and madmen, had before said, in perfect accordance with the above, that the infirmity of madmen was not so much in any 'loss of the reasoning faculties' as in '*delusion*' on their part, or, as he terms it, in their 'mistaking for truths some ideas wrongly joined together.' * * * It may be assumed that these authorities sufficiently fortify the court's position with respect to the true test or criterion of insanity, to justify it in pronouncing that if the evidence in this cause be satisfactory to the existence of *delusion* in the mind of the deceased at the time of his making this will, it is also satisfactory to the existence in the mind of the deceased at that time of *some* degree of *insanity*. * * * The will propounded in this cause—a will virtually disinheriting the daughter—being (plainly so to be inferred) the direct, unqualified offspring of that morbid delusion proved, I may now say, without any qualification or restriction, to have been ever present to the mind of the deceased as to the character and conduct of his daughter—being, if I may so term it, the very creature of that morbid delusion put into act and energy—I at least can arrive at no other conclusion than that the deceased was insane at the time of his making the will propounded in this cause, and consequently that that will itself is null and void in law."

Nicholl referred to no legal authority, and it is evident that his view was derived wholly from medical authorities. It does not appear that he regarded the question as one of law, but rather the contrary, and therefore *Dew* v. *Clark* is not authority ; and, as all subsequent authorities on the same point, are expressly built upon that case as settled law, and are not sustained by reason or principle, they all fall together.

In *Hadfield's Case*, tried in 1800, the great effort of Erskine as counsel, was to induce the court and jury to discard the ancient tests of insanity, to accept the medical theory of their own day, and to acquit on the ground of delusion. The act charged having been committed by reason of delusion, it was necessary for him to maintain only that if there was delusion there was insanity, and not that there was no insanity if there was no delusion. But it was expedient for him, as an advocate, to allay the prejudices of the tribunal, by suggesting that if the new theory proposed by him was adopted, the revered stability of notions would not be further impaired by other similar innovations ; and he professed to admit that in the absence of delusion, his client would have been guilty, although he referred with approval to the case of Ann Broadric, who, in 1795, was acquitted of murder, on the ground of madness without delusion.

In *Dew* v. *Clark*, and in nearly all the cases cited on this subject, there was delusion, and therefore it could not be a point decided, that delusion is the only test. The definitions of mental disease, contained in books of law, show nothing but the former state of medical science,

and they show that only by hearsay. Books written by physicians or men of science, are neither proofs on questions of fact for a jury, nor authorities on questions of law for a court. But such books led Nicholl, in the decision of a question of fact, to pronounce a *dictum* concerning a matter of fact, and that *dictum* has been received as a final determination of a question of law. And if the authorities cited to sustain the verdict in this case on this point, were of any weight, as they are not, this court has not hesitated in *State* v. *Bartlett*, 43 N. H. 224, *Bassett* v. *S. M. Co.*, 43 N. H. 569, and in other cases on various subjects, to be guided by principle rather than by authority.

Insane delusion cannot be adopted as a definition of insanity, on the ground of convenience. Innocent persons cannot be punished as criminals, nor can property and guardianship be disposed of by invalid writings, merely because it is difficult for the court to give to the jury a scientific definition of a pathological fact, which it is the duty of the court not to give. And it has not been shown that there is less difficulty in defining insane delusion, than there is in defining insanity.

Furthermore, if we are to take judicial notice of a fact as settled by the scientific knowledge of experts, we must recognize the fact as established by the unanimous medical authorities of our day, that there is a mental disease sometimes called moral insanity, and that delusion is not the test of it. Hale and Coke adopted the received medical opinion of their day, and Nicholl professed to adopt that of his time, which was in conflict with the former. If we go back to 1826, or 1800, for medical information, we might, with equal reason, go back to the physicians of Hale's time, or to Galen or Hippocrates. If we are to follow a progressive science, it is not necessary to follow at a greater distance than did Hale and Nicholl. If it is necessary that the law should entertain a single medical opinion concerning a single disease, it is not necessary that that opinion should be a cast-off theory of physicians of a former generation. That cannot be a fact in law, which is not a fact in science ; that cannot be health in law, which is disease in fact. And it is unfortunate that courts should maintain a contest with science and the laws of nature, upon a question of fact which is within the province of science and outside the domain of our law. All inconsistencies and difficulties are avoided by adhering to the spirit and elementary principles of the law, which declare that a will cannot be produced by any form of mental disease, and that the indications and tests of mental disease are matters of fact.